# APPENDIX A

Mrs. Susan C. Adams



October 6, 2025

The Honorable Stephanie A. Gallagher
United States District Judge
℅ Office of the Federal Public Defender
100 South Charles Street,
Tower II, 9th Floor
Baltimore, Maryland 21201

Dear Judge Gallagher,

My name is Susan Carol Adams. I began working for the National Security Agency in 1987 and retired in 2023 with over 36 years of continuous service. I carried the title of Cryptologic Mathematician throughout my career, and I retired as a subject matter expert in compliance and policy. I am writing you today concerning Mark Unkenholz, who will appear in your court for sentencing later this fall.

I have known Mark Unkenholz long enough that I can't quite remember *when* exactly we started working together, but I'll estimate it at about 25 years ago. We worked on a number of projects together, spanning several years, in an office which was a predecessor of "the Center," the office in which he worked when he was accused of crimes related to the handling of classified information. Although we have distinctly different skillsets, and often different viewpoints, we developed a solid and effective working relationship, interacting, often on a daily basis, on a wide variety of fascinating topics and exciting projects. When I left that office for an overseas assignment in a related mission area, Mark continued to take an interest in my work and my career, and we have kept in touch more or less regularly ever since. I am proud to call Mark a mentor, a colleague and a friend.

Over my years at the Agency, I saw my share of announcements that someone within the Intelligence Community had been arrested for mishandling classified information. These are usually non-specific, lacking names or particular charges, and serve primarily as reminders to refrain from comment outside proper channels. My reaction to these

announcements has included varying degrees of disappointment, anger and a sense of betrayal.

My reaction to the announcement of Mark's arrest, however, was markedly different. When I read the email, which — unusually —named him, my stomach sank to my toes, because it was instantly clear that something had gone very, very wrong here. Why? Because intentionally committing those crimes is so utterly inconsistent with Mark's character, motivation and practice in every aspect of his work, that it simply beggars belief he could have committed them.

Mark was passionate about his cryptologic work at the Agency, and nothing less than devoted to its mission, in particular, the mission of the Center. Mark is intelligent and highly creative, enjoying the academic exploration of novel ideas to get to the right, most elegant solution for the problem at hand. He gets truly excited about the math and the cryptologic intricacies of the Agency's work. Mark would spend the workday noodling about the details of a problem, stay late to discuss an idea with a co-worker, then come in the next day, having read up on the latest outside papers overnight, with a new idea to try on for size. Mark is also a strategic thinker, thoughtful, considered, patient and ultimately pragmatic. I recall many late evening conversations where Mark and I would work through an approach to a problem: would it work off the chalkboard in real life? what would be the consequences? was the approach legal? was it ethical? was it just the right thing to do? would it succeed in time to make a difference? Mark lived and breathed this work. It was his calling and his life's work.

Mark was also very, very good at the particular kind of work he did for the Center. He was a recognized "master of his craft," commanding respect amongst colleagues across NSA, international partners, and the many junior analysts and mathematicians he mentored over time. There are many projects that yielded tangible national security successes due to his cryptologic innovation, either through his direct participation or his indirect guidance. Unfortunately, due to the fact that the vast majority of the Center's work is highly classified, I can give no specific examples here, but if could, it would be easy to dash off a few more pages of text, listing examples off the top of my head. Given his expertise, history and scope in the organization, Mark was a key leader — a kind of walking encyclopedia for what the NSA:s cryptologic community, and the Center in particular, knew and didn't know, had done and hadn't done, had tried and hadn't tried, and he was an excellent barometer for the likelihood of success of new plans and ideas. It is difficult to see how anyone is better off now that he no longer can work in this field. It is, on the other hand, quite easy to see the loss to the Center, the Agency and the nation.

Unfortunately, it is also easy to see the loss to Mark. This prosecution has shredded him. To have the work that you love, the work relationships you've cultivated, the excitement

that got you out of bed every day, the meaningful purpose behind your daily labor, not only ripped away, but burned down to the ground in an instant, would shred the strongest of us. He is disappointed — as am I — that the Agency, to which he devoted a large portion of his life, did not stand with him and work to untangle or clarify whatever was behind all this. It is a testament to his character and his continued devotion to the Agency's mission that he expressed concern throughout this prosecution about how his statements or actions would effect the Agency and its ability to achieve its goals. In my opinion, he has a lot of reason to harbor ill will, but he does not. Frankly, I didn't know that Mark would be able to reinvent himself after this, because this work was intrinsically who he is, but he has surprised me and heartened me that is trying. And he will recover, not because he will ever be at peace with what has happened here, but because of the abundance of support his family, his friends, and — importantly — his colleagues, both still working and retired, have shown and continue to show for him.

I would be remiss if I ended this letter without saying a few words about classification. Derivative classification, i.e. the process of assigning a classification to the written or spoken word, is as much an art as it is a science, in my opinion. Almost every analyst at the Agency participates in the process, every day, all day long, as they assign classifications to their work product, emails and notes. Original classification authorities (OCAs) produce project-specific security classification guides which state the classification of certain facts about the project and illustrate the fundamental aspects that need protection through classification. But these are, as advertised, "guides." Having advised original classification authorities regarding the production and update of several security classification guides in my career, I can attest that the guides are, in general, good and helpful, but they require constant update and interpretation when they are put to use for derivative classification.

This is particularly true in areas — like the Center — where new ideas, techniques or capabilities are created that just don't fit the mold of what was classified before, or where the landscape informing the classification of facts changes with advances in research and technology. Those working in the Center face an additional complication, and perhaps even jeopardy, when deriving classifications for their work products and emails. This is because the Center's work focuses on public/private partnerships which bridge the gap between classified government needs and unclassified commercial interests in the communications technology arena. Mosts analysts at the Agency never have to address their work in unclassified media or with uncleared personnel, but those in the Center are charged with doing just that.

Correct derivative classification in this environment is not always easy or straightforward. I recall many conversations throughout my career where I debated the classification of a sentence, phrase or concept with colleagues — and even sometimes with the original classification authority themselves — trying to determine the correct level of protection for

what needed to be expressed, not too high and not too low. The best decisions resulted from a deep understanding of the national security interests requiring protection, and a careful analysis of what within the sentence, phrase or concept reflected those interests and how closely. Mark, given his encyclopedic knowledge, and his analytical style and perspective, was a go-to guy for such debates within the scope of the Center's work.

The bottom line here is that I have every reason to believe that Mark knew the guardrails for classification — perhaps better than most — but nothing in his character, his motivations, his intents or his approach with respect to his work, his colleagues or the Agency suggests he would intentionally violate those guardrails. Perhaps he made a mistake. We are, after all, all fallible. But if he did, that mistake has yielded a nightmare: a prosecution, a conviction, a dismantling of his life, and it turns one of the greatest cryptologic intelligence assets this country had into a felon. I am no longer in a position to know what effect this prosecution has had on the work of those still in the Center. But I know that, given the opportunity, I would never work there again, nor would I advise any mentee to do so either, despite that mission underpinning the best thirteen years of my career at the Agency. The risks are too high and too arbitrary now. Because if this could happen to Mark, it could happen to any of us.

Thank you for taking the time to read my letter.


Sincerely yours,

Susan C. Adams